[ Filed July 1, 1890. ]

## STATE OF OREGON, RESPONDENT, v. CHARLES OLDS, APPELLANT.

CRIMINAL LAW—TRIAL—DUTY OF COURT—CHANGE OF VENUE.—It is the duty of a court of justice empowered to try a party for criminal offense, in all cases to see that the party has a fair trial by an impartial jury; and where the party charged with a criminal offense applies to the court to change the place of trial, upon the ground that the inhabitants of the county where the offense is alleged to have been committed are so prejudiced against him that he cannot expect a fair and impartial trial, and the facts and circumstances of the case show that the party is not liable to obtain an impartial jury in such county, it is the duty of the court to change the place of trial to another county.

FACTS EXAMINED AND HELD THAT A CHANGE OF VENUE SHOULD HAVE BEEN ALLOWED.—Where O. was indicted in the circuit court for the county of M. for murder in the first degree, he having killed W. in said county; and after two trials O. was convicted of the crime as charged, which conviction having been set aside by the supreme court, the case was again set for trial, whereupon O. applied to the circuit court for a change of *venue*, upon the grounds that the inhabitants of the county of M. were so prejudiced against him that he could not expect to obtain a fair trial, and showed in his application that the leading newspapers of said county of M. had published full accounts of the former trial, and represented O. as guilty of the offense charged, and one of them contained an article animadverting upon the majority of the members of the appellate court for having set aside the conviction; and it appeared upon the third trial that a jury was only obtained from three hundred names drawn, two of them having been taken after O. had exhausted his peremptory challenges; seven of them stated upon their examination for cause that they had formed and expressed an opinion as to the guilt or innocence of O., and one of them was allowed to sit in the case; *held,* that the court should have ordered a change of the place of trial.

HOMICIDE—JUSTIFICATION.—To justify one person in taking the life of another, it must appear that it was done to prevent the commission of a felony by the latter upon the former.

HOMICIDE—MURDER IN THE FIRST DEGREE.—The killing, however, if not justifiable, is not murder in the first degree, unless done purposely and of deliberate and premeditated malice, or in the commission or attempt to commit rape, arson, robbery or burglary; and there must be some other evidence than the mere proof of killing to constitute it murder in the first degree, unless effected in the commission or attempt to commit a felony; and the deliberation and premeditation necessary in such a case must be evidenced by poisoning, lying in wait, or some other proof that the design was formed and matured in cool blood and not hastily upon the occasion. As in the opinion of a majority of the members of the court, there was no proof in the case of the character above mentioned; *held*, that the evidence was not sufficient to warrant a conviction of murder in the first degree; *held*, *further*, that where the evidence in a case of murder is not sufficient to establish the highest grade of the offense charged, it is the duty of the trial court of its own motion to instruct the jury to that effect; and where it affirmatively appears upon the appeal to this court from a judgment of conviction of murder in the first degree that the evidence was not sufficient to justify it, it is its duty to reverse the judgment.

CRIMINAL LAW—TRIAL—EVIDENCE.—The admission of incompetent testimony in a criminal trial prejudicial to the accused, and which is admitted against his objection, is such an error as will require the appellate court to reverse the conviction obtained therein. Where, in a trial for murder in the first degree, charged to have been committed by the accused shooting the deceased at a certain place, the State, in order to show that the accused was waiting at the place immediately before the shooting was done, introduced a witness who testified that as he passed the place he saw a heavy-set man standing there but did not recognize him as the accused, nor was he able to describe the man so that he could be identified as the accused; *held*, that the statement of the witness to a friend of his, a short time thereafter, upon his hearing that the accused had shot deceased, to the effect that he believed that the accused was standing at the place when he passed by, was not competent evidence; *held*, *further*, that the admission of such statement as evidence under the particular circumstances of the case, against the objection of the accused, was error, and highly prejudicial to him.

APPEAL from Multnomah county: L. B. STEARNS, judge.

This is an appeal from a second conviction of the appellant for the crime of murder in the first degree; the first conviction having been reversed by this court at the October term, 1889. *State* v. *Olds*, 18 Or. 440, S. C. Rep. 940. The cause being remanded to the circuit court, the district attorney moved to again set it for trial; whereupon it was so set for February 12, 1890. The order setting it for trial at this time recites that it was done by consent of the parties; but on the seventh day of February preceding the date at which the cause was set the appellant filed a motion to change the place of trial of the action, upon the grounds that the judge of the circuit court presiding in department No. 2, and the inhabitants

of Multnomah county, respectively, were so prejudiced against him that he could not expect an impartial trial either by said judge or in the county. The motion was based upon the affidavit of the appellant, which stated, in substance, that on the thirteenth day of May, 1889, the indictment was returned by the grand jury charging him with having, on the tenth of the same month, deliberately and with premeditated malice killed Emil Weber; that he was arrested on the day of the homicide, and had ever since been kept in close confinement with no opportunity to prepare for trial; but that the court, notwithstanding his objections, set his case for trial for the twentieth day of June, 1889, on which day he was tried, and the trial resulted in a disagreement of the jury; that the court immediately thereupon, against the objections of appellant, again set the case to be tried July 9, 1889, but it was subsequently continued until the sixteenth day of that month, at which time the trial was had; that on the thirty-first day of July, 1889, appellant made and filed an affidavit, with several extracts from the *Daily Oregonian* and *Evening Telegram* attached thereto as exhibits, in support of it, a motion to postpone the trial until the next term of court; that from said affidavit and exhibits the court was fully advised that the public mind was greatly influenced and prejudiced against him, and could not fail to have known that he could not have a fair and impartial trial at that term of court; that notwithstanding said facts the court overruled the motion and forced him to trial, in consequence of which a verdict of guilty was found against him. He further said that he believed that the said judge was so influenced by the course pursued by said newspapers, and so prejudiced against him, that he could not expect an impartial trial in a court over which he presided; that he believed that the judge was in great fear and dread of attacks from said newspapers if he failed to pursue a course which would meet with their approval; and that such dread and fear would prevent him from pursuing an independent course and give appellant a

fair trial. A further ground for his belief that the judge was prejudiced was, that when he was called into court to have his case set for trial the last time, one of the counsel on his former trial notified the court that the senior counsel who had conducted his former defense was confined to his room by sickness at Tacoma; that another of his counsel who had assisted at the argument of the case in the supreme court had gone to San Francisco, and that the day of his return was uncertain; that another lawyer who had been negotiated with to assist in the defense was confined at home by sickness, and it was impossible to know when he would be able to attend court. The court, however, fixed said twelfth day of February for the trial, although the district attorney expressed his willingness that it should be fixed for a week later, the judge saying that in view of the business on the docket he would not change the time; that, as appellant was informed and believed, there was business on the docket which would have occupied the whole time of the court during the week asked for, and he believed that the only reason why the court refused to allow another week for his counsel to prepare his case was that he was influenced by his prejudice against appellant and his fear of attack by the newspapers; that he believed that the inhabitants of the county were so prejudiced against him that he could not expect a fair trial therein; that in addition to the causes stated in his affidavit and the exhibits thereto attached, were the following: After his second trial and the judgment was entered upon the verdict of the jury, that he caused the case to be appealed to the supreme court, where the judgment was reversed, and after it was known to the *Daily Oregonian,* that paper attacked the decision with great bitterness, and the majority of the court which rendered it; which attack was published therein on the seventeenth day of December, 1889, a copy of which is attached to the affidavit and made a part of it; that the effect of the publication was, as he verily believed, to still further prejudice the inhabitants of the county against

him; to increase the fear of the judge of the court that he would be likewise attacked if he should not please the said newspapers with his action; that the *Evening Telegram*, under date of February 4, 1890, caused to be published in its columns an article relating to his possible application for a change of place of trial, for the purpose, as he verily believed, of forestalling, as far as possible, any action he might think necessary to take in the matter, and, if possible, prevent the court from granting such application, if made, and also for still further influencing and prejudicing the inhabitants of the county against him. A copy of this article was also attached to and made a part of said affidavit.

The attorney for the State endeavored to controvert the said affidavit by the affidavits of a number of persons, stating that they were citizens of Multnomah county, and were acquainted with many other citizens thereof, and believed that the accused could have a fair and impartial trial therein; that a jury could be selected from the body of the county who would not in any manner be prejudiced against him. The said motion, at the request of the said judge of department No. 2, was heard before the judge of said court who presides in department No. 1 thereof, and the same was denied. When the case came on for trial a jury was selected from three hundred names drawn, two of them having been taken after the accused had exhausted all his peremptory challenges. Seven of the jurors drawn stated upon their examination for cause that they had formed and expi ·sed an opinion as to the guilt or innocence of the accused, and one of these was allowed to sit in the case.

Upon the trial the following testimony was given regarding the circumstances of the alleged crime: John Bose testified, in substance: That he was in the employ of Weber; that on the day of the homicide, the tenth day of May, 1889, he started with the deceased to go to their boarding house on Alder street in the city of Portland; that they left the barber shop about 1 o'clock P. M., went

XIX. OR.—26.

west on Alder street, and at the corner of Second and Alder met Mrs. Weber and Miss Walters with a gentleman friend; that they stopped and talked with them five or ten minutes, and then went on; on the northeast corner of Third and Alder streets they met Mr. Gullixon, and Weber ordered a mat from him to put in front of the boot-black stand in the barber shop. They then started across Third street, and when they got within fifteen or twenty feet of the edge of the sidewalk, on the west side of Third street, they looked up and noticed the accused standing at the water-plug at the northwest corner of Third and Alder streets; that as soon as they noticed him he said: "Mr. Weber, I hear you have been round town looking for me?" In reply to which, Mr. Weber said: "You son of a bitch, what do you want of me?" and he hardly had the words out of his mouth when Mr. Olds commenced shooting. The first shot missed Weber, the second one struck him in the back of the neck, and as he was falling another bullet struck him; and after he was down Olds walked up and shot him at another place, and then stooped over and shot him in the back of the head. Five shots were fired. At the time Olds accosted Weber he was standing up against the water-plug, and had his right-hand in his front pants pocket, in which he had the pistol. That when the first shot was fired, Weber threw up his right arm and started to go round the corner of the sidewalk. There was an interval between the first and second shots fired. Witness supposed that a cartridge missed fire or something similar to that. After Olds fired the last shot he walked around Weber's body, looked at witness, and then said: "Now, you son of a bitch, I suppose you will go round looking for me," and then walked down Third street. The witness further stated that Olds was about two feet from Weber when he shot him in the neck; and upon his cross-exami-nation, stated that when Olds spoke to Weber the latter reached his left hand up to his pants pocket; that he was probably five, six or seven feet from him at the time he

answered Olds; that he was putting his hand in his pocket while he was addressing Olds.

H. F. Gullixson testified, in substance: That he saw Weber at the time referred to by witness Bose; that he had got down a short distance from the lower crossing of Third and Alder streets and turned around and looked toward the upper corner of said streets and saw a man fall headlong on his face with his hands out. He fell in a line with the curb. As he fell witness saw another man standing over him with a pistol, shooting. Between the first and second shots there was probably a little more time elapsed than between the other three shots. Witness only saw when the man fell. Did not see the first shot fired. Being on his wagon and driving away, his attention was called from hearing the report of the first shot. He indicated the manner of the shooting by snapping his fingers for the period of time of about five seconds. He identified the accused as being the man who did the shooting and Weber the man who was shot. He stated that after accused shot Weber he turned around and walked upon the sidewalk with his pistol in his hand, and put it into his pocket, and then took his handkerchief out, took his hat off, wiped the lining and his brow, put the hat on and his handkerchief in his pocket and started to walk down the upper side of Third street between Alder and Washington. Witness said he did not notice that he was excited, "except you might say so from perspiring." The witness further testified that he saw the accused as he was walking to the jail with Mr. Hacheney; that he walked past witness' store on the opposite side of the street; that he did not appear to be excited; that he walked along very quietly with Mr. Hacheney.

M. G. Griffin testified, in substance: That he resided in Portland and was a real estate investment agent; that about one o'clock in the afternoon of the tenth day of May, 1889, he was on the east side of Third street about eighty feet from the corner of Alder, and from ninety to one hundred feet from the water-plug in question; that he

heard a shot which attracted his attention; that before he could locate it two or three shots were fired. He then saw the accused, when the fourth shot was fired, "stoop over a prostrate form and very deliberately shoot into the body, the back of which was toward him. He shot again; then the accused looked at the body very calmly, walked a step or two, threw back a part of his coat, put in his revolver, then put his hand behind his back and took out a handkerchief (as calmly as I am doing it now), took off his hat, wiped his brow, wiped his hat, and at the same time he walked around the body and looked at it a couple of times; then he put on his hat and walked north on Third street very slowly; then he commenced to quicken his step, and several spectators gathered and said this man ought not to be allowed to go"; that witness ran across the street and put his hand on the shoulder of the accused and told him he thought he ought to go to the city jail; then Mr. Hacheney said he would take him down, and the accused said he would go with him.

Milton Weidler testified, in substance: That he was secretary of the Portland fire department, and that was his business and occupation in May last; that he was not acquainted with the defendant Charles Olds, or Sandy Olds; that he had seen him; that he saw him about four or five days before the shooting of Weber in front of the Magnolia restaurant; that as witness was going into a restaurant there were four or five persons standing just outside of the entrance, and as witness came up one party mentioned Olds' name; that he did not know whether it was an introduction or not, and in looking around he saw the accused; that that was all. The witness was then asked: If about one o'clock on May 10th last he saw the accused, and where it was he saw him? To which the witness answered: "No, sir; I won't swear that I saw him."

Witness was then asked the following question: "State if you saw any one upon that day at the corner of Alder and Third?" The question was objected to by defendant's

counsel unless there was testimony tending to show and
identify the defendant; whereupon the counsel for thy
State said: "We will bring it directly home by this vere
witness." The court thereupon overruled this objection,
and the defendant excepted to the ruling. The witness
then answered; "I left the Magnolia restaurant about one
o'clock, * * * and passed down Alder street, and there
was a man standing in close proximity to that fire-plug
there. I paid no particular attention to him and passed
on, and I noticed that he was a heavy-set man, and his
back was toward me as I passed on down, and I went on
down Third street to Washington." Witness further said
that he "did not particularly observe the color of the per-
son's hair and his clothing; merely noticed that there was
a heavy-set man standing there"; that was all he noticed;
that he passed on down Washington street on the north
side of it, and that when about half way between Third and
Second, a boy came running along, and the shooting was
spoken of; the boy said Olds shot Weber. The defendant
objected to what the boy said. The witness then went on
to say what occurred to him, and an objection was inter-
posed on the part of the defendant. The counsel for the
State then asked the following question: "Just state that
as to what party was standing there?" which was objected
to by defendant. Whereupon the court said: "I think
he may state it"; to which the defendant excepted.
Counsel for defendant then objected to the witness stating
what occurred to him at the time; to which the court said:
"Very well; answer." Defendant excepted. The witness
then said: "Shall I answer what I said?" to which the
court replied: "Yes; answer the question." The witness
then proceeded to say: "The boy said Olds shot"—
when an objection was interposed on the part of the
defendant as to what the boy said; whereupon the court
remarked as follows: "What occurred to you is what you
were to state; what you said at that time." Counsel for
the defendant objected to what the witness said at that
time for the reason that it was incompetent, immaterial

and hearsay. The court overruled the objection, the defendant excepted, and the witness answered as follows: "I said to this friend of mine, 'I believe that Olds was standing on the corner when I passed by.'" The witness further stated that he did not know anything that caused him to believe it. He was then asked by the counsel for the State what his impression was as to the person that was standing there at the time; which question was objected to by the defendant's counsel as incompetent. The court overruled the objection, and the defendant excepted to the ruling. The witness then answered that he merely coupled the fact of a man standing there with the tragedy occurring a few minutes afterwards; that he coupled the two as any one would, and merely said that he believed that Olds was standing there as he came down; that he did not pay any particular attention to the man as he stood there; that witness was merely passing by and saw the figure was there. He was a heavy-set man, but "I would not be willing to swear that I noticed his complexion."

Blanche Martin testified, in substance: That she had been residing in the city since 1881; that she remembered the circumstances of the shooting on the tenth of May, 1889; that she was at the time on Third street, between Washington and Alder; was coming up Third street; that she heard a shot, but did not know it was a pistol shot, nor pay any attention to it; then saw the confusion around; looked up and saw a man just fall, and then saw another stoop over him and fire three shots when he was already down lying on his face; that there were three shots fired into his body; that after he had done that he stepped on to the sidewalk, took his hat off, wiped his brow and his hat and then walked down Third street. Would not swear that the accused was the man she saw at the time.

C. E. Hoxie testified, in substance: That he was police officer of the city on the tenth day of May, 1889, and was acquainted with the accused; that he had a conversation with him on the way from the police station to the county jail; that when we got nearly up to the corner of Third

and Alder, he said: "This is the place. I was walking
up Third street with my hands in my pocket and my head
down, and when I got near to the corner I looked and saw
Weber on the crossing of Third street. When I saw him
I said: 'Mr. Weber, I understand you have been looking
for me?' And Weber said: 'What do you want of me?'
Weber went down with his hand toward his pocket, and I
never waited. I pulled my gun and began shooting. The
first shot I missed him. Weber put up his arm and I
reached over and shot him in the neck and he fell, and I
shot him again."

J. F. Clark, a book-keeper residing in Portland, testified,
in substance: That, on the tenth day of May, 1889, about
one o'clock P. M., while on his way from his house to the
store, after he got past Third street about fifty feet he
heard the quick crack of pistol shots; that he turned
around, and just as he turned saw the accused step off the
sidewalk and fire two shots into the body of another man.
The body was lying close to the curb, the feet toward the
curb and the face lying in the dust toward Alder street.
The accused, after he fired those shots, walked right
around the head of the body, took his handkerchief out
and wiped his brow, also wiped his hat, and then placed it
on his head and walked off down Third street. That it
looked to him, the distance he was away, as though he did
it pretty cool.

Mrs. Weber, wife of the deceased, testified: That she
and her husband boarded at the Magnolia restaurant on
Alder street; that they had been boarding there about six
months; that she knew the accused by sight, and that he
knew they were boarding there; that he had seen them
going in and out of there frequently. Witness also testi-
fied that her husband's right hand was crippled, and that
when walking in the street he most always carried it in
his pocket; that she had been married to deceased about
two years; that he had a former wife, but she had obtained
a divorce from him.

M. C. Sullivan testified, in substance: That he was a

detective by occupation and resided in Portland; that he had business at Freeborn's store, between Washington and Alder streets on the west side of Third; that he was leaving the store when he saw Olds, just before the homicide; that he (Olds) was moving toward the corner very slowly, perhaps fifty feet from the corner, perhaps further; that he had his face turned like as though he was looking toward Second street, going along in a very slow gait; that witness walked down on Washington street, when he heard the shot; that the distance he walked from the time he saw Olds until he heard the shot was about two hundred feet; that he has walked it since in a minute and a half; that he was in a hurry after leaving Freeborn's and walked pretty fast.

Charles Sliter was called as a witness on the part of the State and testified, in substance: That he was one of the proprietors of the Crystal Palace saloon; that Olds' business was that of running the Olympia club-rooms up stairs over the Palace saloon; that the business belonged to an association of which Olds was the principal party; that witness was the lessee of the building and leased the club-rooms to the association, the managers of which were Olds and Frank Lynch; that witness' saloon furnished the liquor for the association's rooms; that on the morning of the shooting, somewhere in the neighborhood of eleven o'clock, Weber and a Mr. Drugan came to the Palace saloon and had a drink. "Mr. Weber said to me: 'I suppose you heard about the trouble I had the other day.' I said, 'Yes.' 'Well,' he says, 'I broke some glassware and done other damage here; whatever it is I will pay for it.' I told him there was no pay so far as that was concerned; it was all right; the trouble in the house I cared more about than anything else. 'Well,' he says, 'I came up to day—this morning; I want to talk to you about this red-headed son of a bitch up stairs. I know he is running a game up there, and he shall not do business in the town while I am in it.' And with that I was busy and stopped talking, and our conversation went on at intervals, broken

like, because people were coming in and out all the time, and I was behind the bar and had to do the work. And finally Mr. Weber said to me he would come over again when I was at leisure. 'Anyway,' said he, 'I am going to have him vagged to day, and I will see what I can do with him.' So somebody else came in, and he stepped over to a writing desk in the corner of the room. Mr. Drugan was with him. They carried on a conversation. I was quite busy at that time, and Mr. Weber called out to me and said: 'I see you are busy; I will see you again after awhile'; and he went out." The witness then said that just about noon he went out of the saloon to go to his up-town place. The witness continued his testimony as follows: "I went out and was looking for a street car, and just as I stepped out of the front door Mr. Olds came up, and I said, 'good morning,' and he said, 'good morning;' and he says to me, 'I understand Weber has been around again.' I says, 'Yes; he was here and he is pretty hot, and he talks pretty bad'; and I told him about the conversation we had, and told him also about his having him vagged. I then told Mr. Olds that I thought the best thing he could do was to keep quiet or to go away awhile; go away somewhere until the thing quieted down; and it probably could be settled satisfactorily in some way. Mr. Olds says: 'Well, I will tell you; if you think I am any detriment to the house, I would rather go away.' 'Well,' I says, 'that is my judgment; I think you had better go away for awhile,' and at that the car came along and I jumped on the car, and that was our last conversation." The witness also testified that Weber had been at the Crystal Palace saloon several times before this inquiring for Olds and "looking" for him, and that this was what Olds referred to when he said he understood Weber had been there again; that Weber threatened to inform on the house; said that he (Olds) should not do any business while he (Weber) was in town; that he would inform against the house and against Olds for carrying on a gambling game; that he thought to that extent Olds was a detriment to the house; that he did

not want any trouble there; that the business was carried on by the Olympic association; that it was an incorporated institution. The witness also testified, against the objection of counsel for the accused, that he (witness) was the responsible man in the association.

The State thereupon rested.

The accused did not deny the killing, but claimed and attempted to prove that it was done in self-defense.

E. A. Post, a witness for the defense, testified, in substance: That he resided in Portland; that he had no occupation at present; that he had just left the hotel business; was one of the proprietors of the Gilman House; was acquainted with Weber; that the latter had a place of business fifty feet from the Gilman House in 1883 or 1884; that he always considered him a person disposed to be quarrelsome, vicious, irritable and dangerous; that he (witness) used to drive a soda wagon and was in his (Weber's) place every morning; knew there was a disturbance there several times, and they all seemed to blame Mr. Weber for it. His reputation was that of a person who would shoot; had seen him carry a pistol; seen him take a pistol out of his drawer and put it in his pocket when he went off watch (meaning when Weber left his saloon for any length of time); would not swear that it was the pistol shown him in court, but stated that it was one like that.

C. W. Holsapple testified, in substance: That he was a police officer of the city and acquainted with Weber in his life-time; that he had the reputation of being very quarrelsome and disagreeable to get along with, and that he wood shoot. Counsel for the State, upon the cross-examination of the witness, showed that the latter had arrested Weber several times for gambling, and attempted to show that the persons whom he had heard speaking concerning Weber's character had done so from the fact that Weber claimed that the police officers should not interfere with him in carrying on a gambling business while they permitted others to do so; and did show that upon one

occasion when he arrested Weber for gambling that Weber told him that if he would go with him to a certain place he would show him where there was gambling, and that the witness told Weber that one at a time was all he could handle; that after he took him down to the station that he would see if there was gambling going on at other places, but did not arrest anyone then, not at that particular time.

William Summers testified, in substance: That he was acquainted with Weber; knew him in the winter of 1881; first became acquainted with him in Laramie City, Wyoming Territory; used to be very intimate with him; was in his employ both in Wyoming Territory and Portland; in the latter place about nine months and in the former place about three months; that Weber was engaged in the saloon and gambling business; that his reputation was bad; that he was believed among those with whom he associated, and understood generally to be one who would shoot; that he and Olds were not on friendly terms; that he heard him say at the corner of First and Alder streets, Portland, more than a year ago, something about a "big son of a bitch: some people were bigger sons of bitches than others—back-cappers"; that he (witness) turned around and said, "What do you mean"? and Weber said, "I mean that big red-headed son of a bitch standing there," referring to Olds; that Olds turned and walked around the corner of the sidewalk out of the way; that Weber was in the habit of carrying a pistol in front of him, inside his pants; that the pistol in court is the same kind of a pistol he used to carry; that he had seen him handle it with both his right and left hand; that his right hand was drawn up and he could not open it to the full extent; that he had seen him take a gun in this hand (referring to a pistol); that Weber told him that he had braked on the Union Pacific railroad between Laramie City and Green River, and between Laramie and Rawlins, Wyoming Territory; that his reputation there was bad. Witness said, on his cross-examination, that he came to this country with Weber, and that the latter paid his way out here; that he

was a pretty good man when he came here; that, as a man to work for, he so regarded him; that he never had any trouble with him but once, and that settled it between us two; that he could not say that he testified on the former trial that Weber's bad reputation arose out of an order that gambling should not be allowed on the first floor, and of his declaration that if gambling was not allowed on the first floor it should not be allowed on any floor; that his reputation became worse after that time than it was before; but that was not the first that started it; that Weber was interested with Jacob Weber, Paul Furay, Isaac Gratton, and, he thought, James Furay, in the Brunswick billiard hall—a gambling house and saloon; that witness was working there at the time, could not say that his reputation among those people was good; that he had been closed up in his gambling house previous to that time; that his gambling house on the corner of First and Alder had been closed by the authorities, and after that he went into business with Jacob Weber, Gratton, Furay and Vernon; that he had heard men in his profession say that his reputation was bad; but could not say that it was any worse after he left the Brunswick billiard hall than it was previous to that time; that he was considered by men in his profession a dangerous man; that he would use a gun, pistol, knife, poker, or anything else; that everybody at the Brunswick billiard hall who was interested in the house had no love for him; that there was more or less rivalry between him and them; they were engaged in the same kind of business; that witness was "now" a saloon man at Aberdeen, W. T.

Joseph Day testified, substantially: That he was a police officer in Portland, and had been such since the first of August, 1888, and had been such officer at a time previous to that; that he knew Weber's general reputation for being a violent, vicious and dangerous person; that it was bad—a quarrelsome man; that he knew Olds; that he had a conversation with Weber about two days before the shooting occurred. "I saw him as I was going down Third street. He was walking up the street. I looked at

him and says, 'You look from the looks of your eye as if you had been having a scrape.' He says, 'Yes; the son of a bitch that did that—I will make him jump off the wharf, or the dock'; I don't remember which words. I says, 'Weber, if I were you I would not have any trouble about anything like that; it won't do any good to make any talk like that.' He says, 'I will kill the son of a bitch on sight.' I says, 'Weber, you hadn't ought to talk that way. You know I am a police officer, and that is not very good talk for you to make, because if this man should hear it he might not give you an opportunity to do that.' 'Well,' he said, 'it don't make any difference to me whether he does or not,' and I walked away and went down to the station."

J. F. Watson testified, in substance: That he was a captain in the police force, and had been a police officer for twelve or fourteen years; that Weber's reputation was bad, and that Olds' reputation in the community as a peaceable, quiet citizen. was good.

J. M. Gilman testified, in substance: That he lived in Portland; was a steamboat man, and owned the Gilman House; that he knew Weber, and that his reputation was bad.

John Minto testified, in substance: That he resided in Portland, and that he saw the fight which occurred between Weber and Olds a few days before the homicide; that he was standing on the sidewalk in front of the Crystal Palace saloon. "Olds was standing on the edge of the platform in front of the saloon, with his face towards the street, leaning on a small cane. Weber passed directly behind Olds and looked into the saloon, and turned around and came to Olds from behind, ran against him and pushed him off the platform on to the sidewalk. Olds dropped the cane and hit Weber in the face; hit him two or three times. After the first lick Weber threw up his hands to his face, and Olds hit him three or four times about that time. They scuffled a short time. Weber seemed to stoop down and got both hands up to his face and started for the saloon door. Olds was on the back of his neck and hit

him once or twice in the neck and back of the head, but both went against the door, pushed it open and went inside.   As soon as the doors were open Weber started to the bar, evidently to get hold of tumblers, Olds still having hold of him; but he got to the counter and got hold of two or three tumblers and stepped back.   Olds let go of him, turned, almost facing him, and said:   'Throw it, you son of a bitch; you don't dare to throw it.'   That was the first word spoken from the time they commenced.   Weber threw one of the tumblers at Olds and missed him, and Olds hit him again; and as Weber stooped to pick up one of the tumblers he had dropped after he threw the first one, Olds again hit him.   By this time they had clinched; were scuffling and went over the left side against the wall. The bar tender then interfered and said:   'Don't knock those pictures off the wall.'   They both seemed to be pretty well out of breath, and separated.   No one interfered to any great extent before they were separated.   Neither of them was knocked down.   Weber threw the glass with his left-hand.   Witness called his attention to it in talking to him afterwards; told him he did not know he was left-handed before."   Witness further stated that he was a real estate man; that he had formerly been sheriff of Marion county.

Frank Summers, bar tender at the Gilman House, testified, in substance:   That about a year before he heard Weber, in front of the Brunswick billiard hall, about the time he was arrested, say to Olds:   "You dirty son of a bitch, I have got it in for you; you are the cause of this." Olds said to him, "Keep away from me; I do not want anything at all to do with you."   "And he started to walk away from Weber, and the latter followed him up and kept talking to him in that way."   Witness also testified that Weber's reputation was not very good; that he had heard that he would use a gun; that Olds' reputation was good.

Paul Furay testified that he resided in Portland; that he had been bar tender for Weber; that he was acquainted

with his general reputation as a vicious, quarrelsome, dangerous person, and that it was bad; that after the fight they had at the Crystal Palace saloon he told witness up at his room that it was not over yet; that he would be fixed for him the next time he saw him, and identified the pistol in court as the same one Weber used to carry.

Albert Richster testified that he was a bar keeper; had been living in Portland ten years; knew Weber in his lifetime and was acquainted with Olds; that on and just prior to the tenth day of May, 1889, he was at the Crystal Palace saloon; that he recollected the fight which occurred between Olds and Weber in the early part of May at the saloon, but was not present at the time; that Weber was there about half a past five o'clock of that day; that he came in and asked how many glasses were broken, and that he (witness) referred him to Mr. Watson; that he then inquired where Olds was, referring to him in his usual style of designating him, and said, "If he is up stairs, call him down; I will make him leave town; I will do him up; I will make him jump into the river." That that was the day before the shooting. That he came back that evening about eleven o'clock and asked witness the same question again; said he could not work in this town; that witness communicated to Olds that Weber had been looking for him and told him what Weber had said; that he had never spoken six words to Weber, but had always heard that his general reputation was bad; that Olds' reputation as a quiet, peaceable person was good. That evening when Olds came down from up stairs he waited until I closed up the saloon; it was one o'clock; that Frank Lynch and he (witness) walked home together and that Olds was with them and on the inside; they walked up Washington street to East Park, where they left him (Olds), and he went up East Park; that Lynch told Olds that he had better get in the center; that Weber might be around one of "these corners," and that Olds stepped between Lynch and witness and walked up Washington street.

Edward Holman, the undertaker, who took charge of

Weber's body, testified that he saw a pistol after they had raised the body from the sidewalk; it was lying down on the sidewalk; that in raising the body up he thought that the pistol was lying right underneath him; that he put a tag on it and gave it to Sheriff Kelly; could not tell whether the pistol was lying there or dropped down there when the body was picked up; thought the pistol was very similar to the one in court; that it was loaded. Witness also stated that there was a brass weight found there at the place about the size of an iron weight for scales marked 200 pounds.

Penumbra Kelly, sheriff of the county, testified that the pistol in court was the same one got from Edward Holman; that it was loaded at the time he received it.

David Campbell testified that he resided in Portland, and on the tenth day of May, 1889, was there; that he was driver in the fire department, and acquainted with Olds; that at the time the shooting took place he was on Fourth and Alder exercising the horses, riding horseback; that just previous to that he had been right where the shooting was done; that he was well acquainted with Olds, but did not see him there; would have known him if he had seen him; that it was just long enough for him to go from there to Washington, up Washington to Fourth, up Fourth to Alder, before the shooting occurred; that the horses trotted all the way.

Frank E. Richardson testified, among other things, that he saw Olds coming up Third street just before the shooting, and also saw Weber and Bose crossing the street; did not pay much attention to them until he heard a shot fired; that Weber and Bose had not got off the curb on Alder street when witness first saw them; that when he looked up after the shot was fired he saw Weber standing on the crossing on west side of Third where it intersects Alder; that he went over and helped pick him up after he was shot; that he saw a brass stopper or plug in the street under him when he lifted him up; that he saw a pistol; Mr. Holman picked it up; that he was put in jail as a witness

for the State, and was held until the trial of Olds began; that he was not called on either trial as a witness for the State.

M. J. Kochman testified that he saw Weber and Olds standing together and saw Weber make a motion for his hind pocket. Question by defendant's counsel: "What pocket?" Answer: "For his hind pocket, or for his pocket; and immediately after that heard a shot fired, and almost immediately another one, and then saw Weber fall, and in a very few seconds after that Olds fired three more shots in his back over him."

S. B. Parrish, chief of police of the city of Portland testified that soon after Weber was killed, he was at the place of the killing; that he saw the pistol picked up from the ground; that when they turned Weber over it was under him, and was picked up then; that he recognized the pistol in court as the one picked up.

Several other witnesses, including the accused himself, gave evidence on the part of the defense; but in the main it was only cumulative of that which was already given.

The accused, however, in his testimony made a full statement of his antecedents, of his relations with Weber and of the circumstances relating to the killing.

The State also called three or four witnesses to rebut the evidence of the defense regarding Weber's reputation as to his being vicious and quarrelsome; also sought to impeach some of the witnesses for the accused by attempting to show that they had testified differently from what they did on the former trial. Several of the witnesses for the defendant were gamblers, and the counsel for the State proved by them upon their cross-examination that the gambling fraternity of Portland and other places had raised a fund to assist the accused in his defense to the charge against him; and the district attorney, in his closing address to the jury, made statements concerning the testimony so elicited and drew inferences therefrom which the counsel for the defendant claimed were unwarranted, and which operated prejudicially to the defendant.

After the testimony was closed the trial court charged the jury generally as to the law of the case, to which no exceptions were taken that are relied upon by the defendant's counsel. Said counsel, however, saved exceptions to the refusal of the court to give two instructions requested by them, and on which they do rely. The instructions so requested and refused are as follows: (1) "It is your duty to reconcile the evidence in this case with the defendant's innocence if you can consistently do so." (2) "You cannot find a verdict against the defendant unless you find that his guilt is in all things consistent with the evidence in the case, and wholly inconsistent with any reasonable hypothesis of his innocence."

The jury returned the following verdict: "We, the jury, find the defendant Charles Olds guilty of murder in the first degree, as charged in the indictment."

The counsel for the defendant thereupon moved the court to set aside the said verdict upon several grounds specified in the motion filed. The court overruled the said motion, and adjudged that the defendant be hanged; which is the judgment appealed from.

*C. B. Bellinger*, for Appellant.

There is no evidence tending to prove deliberation, premeditation or malice. The State relies upon the alleged fact of a lying in wait as authorizing a presumption of deliberation and premeditation. The "lying in wait" is inferred from the alleged fact that the defendant was at the place of the homicide on the street shortly prior to the meeting; and the fact that he was so there is inferred from the doubtful circumstances that he was seen walking slowly in the direction of the place of the homicide and fifty feet or further distant by a person who met him and who was himself walking rapidly and who had only time to walk two hundred feet after seeing the defendant before he heard the shooting.

The fact of lying in wait relied upon to create a presumption of deliberate and premeditated malice cannot itself be

presumed. It must be proved as a fact. There is no such thing as a presumption from a presumption. A presumption is an inference of fact from a fact *proved.* "A presumption of fact is a logical argument from a fact to a fact, or, it is an argument which infers a fact otherwise doubtful from a fact which is proved. Hence a presumption of fact to be valid must rest on a fact in proof." Wharton's Criminal Ev., § 707. No inference of fact or of law is reliably drawn from premises which are uncertain. Whenever circumstantial evidence is relied upon to prove facts, *the circumstances must be proved and not themselves presumed. Ibid,* note 2. "A presumption which the jury is to make is not a circumstance in proof, and it is not therefore a legitimate foundation for a presumption. It, the presumption, must rest on established facts." *Douglas* v. *Mitchell's Executors,* 35 Penn. St. 440; *King* v. *Burdett,* 4 Barnwell & Ald. 160. One fact cannot be presumed from another which is itself but an inference. *McAleer* v. *McMurray,* 58 Penn. St. 126; *State* v. *Lee,* 17 Or. 488; *People* v. *Kennedy,* 32 N. Y. 145, 146; *Copeland* v. *State,* 7 Hump. 484.

In this case the only direct evidence as to the time the defendant was at the place of the homicide before the shooting is the testimony of the witness Richardson, who testifies that he saw the defendant and the deceased approach the corner and each other at the same time. "The foundation of a presumption is always one or more facts, *having the quality of certainty,* and in this respect distinguishable from the fact sought." Facts, therefore, from which a presumption is to arise, must have the quality of *certainty.* Burrill on Cir. Ev., page 13.

The State relies upon an inference of malice from the fact that deceased had, on the morning of the homicide, threatened to have defendant vagged, and to inform on the house where defendant was employed. No unfavorable inference against the defendant can be drawn from the fact of threats or injury by the deceased against him. The law will not permit a presumption that, because a

man has been the subject of an injury done or threatened, he therefore intends a wrong. A person cannot be deprived of the presumption of innocence, which the law declares in his favor, as a penalty for the injury which another person has done him although he has himself been without fault. The statute presumption is that a person is innocent of crime or wrong. Civ. Code, § 766.

The State also relies upon the fact that after the shooting the defendant said, applying an epithet to deceased: 'I suppose you will go round town looking for me"; the contention being that this shows that defendant knew deceased had been looking for him, and that therefore there is an inference that defendant was looking for deceased. The considerations urged as to the point last stated are conclusive as to this point also.

The fact that defendant fired three shots after deceased had fallen, and the manner of the shooting, is also relied upon. The undisputed facts are shown by the State's witnesses to be that the shooting was the work of five seconds from the beginning.

This shows that the defendant was acting under great excitement, or from passion, or both. Passion and malice are inconsistent. 2 Bishop's Crim. Law, § 697. So that if an act proceeds from the one, it does not proceed from the other. Where the evidence against the verdict is overwhelming, although there is evidence to sustain it, a refusal to grant the motion is an abuse of discretion, and will be reversed on appeal. *Smith* v. *Athern*, 34 Cal. 506; *Dickey* v. *Davis*, 39 Cal. 569; *Guerro* v. *Ballerino*, 48 Cal. 118; *Branson* v. *Carruthers*, 49 Cal. 375; *Moss* v. *Atkinson*, 44 Cal. 16. In criminal cases a more liberal rule obtains. In such cases new trials have been constantly granted upon the ground that the verdicts were not warranted by the proof. *Dane* v. *The State*, 2 Hump. 442, 21 Tenn.; *Bedford* v. *The State*, 5 Hump. 552, 24 Tenn. Because, by the entire spirit of the criminal law, the prisoner is under a protection from the judge which a party in a civil suit is not, many deem, and it is rightly believed, that new

trials should be awarded more freely in criminal cases than in civil, and in criminal the more freely in proportion to the gravity of the punishment. 1 Bishop on Crim. Procedure, § 1273.   ''It is difficult to perceive how, in a criminal case, where the interests of the State are even more injured by wrongful conviction than  those of the defendant, the judicial mind can be satisfied with a verdict of guilty, which, after giving the opinion of the jury all due weight, creates still the distinct and not unreasonable apprehension that a great wrong may have been done, though there is no absolute showing that it has been, alike to both parties in the controversy." *Idem*, § 1278. The rule that an appellate court will not interfere to set aside a verdict unless it is palpably against the evidence, obtains in the largest sense in civil cases, but it is not applied in criminal cases, especially where life is at stake. *Falk* v. *The People*, 42 Ill. 331; *Owens* v. *State*, 35 Texas, 369; *Turner* v. *State*, 38 Ib. 169; *State* v. *Webb*, 41 Ib. 68; *Copeland* v. *State*, 7 Humph. 479; *Cochran* v. *State*, Ib.; *Leake* v. *Seate*, 10 Humph. 143; *State* v. *Tomlinson*, 11 Iowa, 401; *Sargent* v. *People*, 64 Ill. 327; *State* v. *Packwood*, 26 Mo. 340; *People* v. *State*, 36 Cal. 531; *Manuel* v. *People*, 48 Barb. 548; *State* v. *Miller*, 10 Minn. 313; *People* v. *Kohler*, 49 Mich 324; *State* v. *Sopher* (Iowa) 30 N. W. Rep. 917; *People* v. *Mangano*, 29 Hun. 200; *Milton* v. *Stat*!, 6 Neb. 138.   In the two last above cases the judgments were reversed, because there was not sufficient evidence of deliberation and pre-meditation.

Hilliard on New Trials, Chap. 14, §§ 13, 19, 20, 21.   But it is held in numerous cases, and perhaps the weight of authority is now to that effect, that *strong preponderance* of evidence against the verdict will justify a new trial." *Idem*, § 21*a*.

Wharton's American Criminal Law lays it down that "a conviction clearly contrary to the weight of evidence will be set aside," and probably fifty cases are cited in support of such rule.   3 Wharton's Criminal Law, § 3110.

The authorities are simply overwhelming, that in a

criminal case, and more especially in a capital case, the verdict will be set aside when it is contrary to the weight of evidence. The rule that the court will not, on appeal, set aside a verdict on the ground that the evidence is not sufficient to sustain it, has been adopted in this State in civil cases. But that rule has never been recognized in a capital case, unless the remark of the judge in the case of *State* v. *Mackey,* 12 Or. 154, can be given such construction. The judgment in that case was reversed, however, on other grounds. In *State* v. *Hunsaker,* 16 Or. 497, the opinion is expressed, without deciding the point, that the power of the court, in criminal cases, to look into the evidence to see whether the verdict is justified by it or not, is beyond doubt; and in *State* v. *McGinnis,* 17 Or. 332, the court felt it a duty, *inasmuch as it was a capital case,* to examine the record and see whether there was any error or any ground whatever for the appeal, although the usual practice would have been to affirm the judgment, there being no brief nor appearance on appeal. In *Anderson* v. *The State,* 43 Conn. 514, where there was a conviction of murder in the first degree, the court directs a new trial, and says: "If we are to make a rigid application of the rules which govern the superior court in civil causes, we should doubtless advise that a new trial should be denied; but in a case where a human life is at stake, justice, as well as humanity, requires us to pause and consider before we apply those rules in all their rigor."

In *State* v. *Clements,* 15 Or. 243, which was not a capital case, the court say the sufficiency of the evidence to sustain the verdict will be considered on appeal when the point is presented by exception. In a capital case, how-ever, the court will review the instructions that were given, although no exceptions were taken or saved to the rulings of the court by the defendant. *State* v. *Packwood,* 26 Mo. 341; *Falk* v. *People,* 42 Ill. 335. And so too where the defendant's counsel did not ask the court to charge the jury as they should have been charged, and the court doubted whether the question was presented so that it

could consider it, nevertheless, the case being a capital
one, the court did consider it and reversed the judgment.
*State* v. *Johnson*, 40 Conn. 142; *People* v. *Levison*, 16 Cal. 99.
In *People* v. *Bowers*, 79 Cal. 415, a very recent Califor-
nia case, the court reviewed the evidence in a capital
case, where it was conflicting, and granted a new trial.
*State* v. *Forsythe*, 89 Mo. 669; *Penn. R'y Co.* v. *Zebe*, 33 Pa. St.
318.    There is no case where the court has refused to set
aside a verdict clearly against the weight of evidence
when life was at stake.    There is no case, civil or crim-
inal, where the court has held, without reference to the
consequences, that a verdict wholly unsupported by
evidence would not be reviewed on appeal.    The court
erred in permitting Weidler to testify against objection
that he said to a friend when he heard of the homicide: "I
believe Olds was standing on the corner when I passed
by."    The jury must have understood from the ruling of
the court that such a statement was admissible to prove
that Olds was on the corner some time previous to the
homicide.    *State* v. *Ching Ling*, 16 Or. 419; 18 Pacific Rep.
847.    The statement was elicited to prove the main fact,
and not to contradict the witness.    1 Greenleaf's Ev. § 444.
*Langford* v. *Jones*, 18 Or. 307; 22 Pacific Rep. 1064.    Weidler's
statement was not voluntary, but was made in answer to a
direct question by the State and after objection by defend-
ant, which was overruled.    The court erred in refusing to
instruct the jury to the effect that the testimony in the
case must not only be consistent with guilt, *but inconsistent
with any reasonable hypothesis of innocence.*    The failure to
so instruct the jury is error.    *People* v. *Dick*, 32 Cal. 213.
It is important that the jury should have all the negative
or counter hypotheses of which the case will reasonably
admit.    The consequences of overlooking a single one are
sometimes deplorable.    Burril on Cir. Ev., chap. 4, page
187.    See also *idem*, pp. 181, 185, 187, 189; 3 Greenleaf's
Ev., § 137.    The general instructions furnish no proper
guide as to the matters covered by the instructions
requested.    It is not enough that the principle of these

instructions can be gathered from the general charge, as a matter of argument.

The statements of the district attorney in his closing argument of matters not in evidence, nor proper for their consideration, and his appeals to the prejudices of the jury, are grounds for a new trial. A portion of these matters were distinctly objected to at the time. In civil cases an argument not based on evidence, made against objection, will be ground for a new trial. *Rolfe* v. *Rumford*, 66 Me. 564; *Tenny* v. *Mulvaney*, 8 Or. 522; *Tucker* v. *Henniker*, 41 N. H. 318. In criminal cases the rule is more stringent. *Ferguson* v. *State*, 49 Ind. 33; *People* v. *Quick*, 58 Mich. 324; *People* v. *Dane*, 59 *idem*, 552; *State* v. *King*, 44 Mo. 238. It is the duty of the court to stop the district attorney *on its own motion* when he states facts not before the jury, or uses vituperation and abuse predicated upon alleged facts not in evidence, and calculated to create prejudice against the prisoner. *State* v. *Gutekunst*, 24 Kan. 252; *Jenkins* v. *Or. Dressing Co.*, 65 N. C. 563; *State* v. *Williams*, *idem*, 505; *State* v. *Smith*, 65 N. C. 369. A new trial was ordered where the court sustained an objection to the language, and admonished the attorney that it was improper. *Long* v. *State*, 56 Ind. 186; *State* v. *Graham*, 62 Iowa, 108. Where the court in a capital case interfered, rebuked the attorney, and instructed the jury to pay no attention to the statements, but it was impossible to say that no injury resulted to the defendant therefrom, a new trial was granted. *People* v. *Bowers*, 79 Cal. 415. The refusal of the court to pass upon defendant's motion for a change of venue was error. The motion was made upon affidavit, showing among other things, prejudice on the part of the judge. A matter of this kind is addressed to the judge himself. He alone knows the state of his own mind. Another judge is not qualified to pass upon the question. The trial judge is required, where the penalty may be death or a long term of imprisonment, to listen with care to the testimony presented to show his own bias or prejudice. *Emporia* v.

*Volmer*, 12 Kan. 627. The challenges to seven of the jurors, for cause, should have been sustained. It is certainly not an open question that a juror who has formed and expressed an opinion has prejudiced the case, and is not a qualified juror. Wharton's Crim. Law, §§ 2978, 2981. The applause in the court room that followed the conclusion of the district attorney's argument is ground for a reversal, especially in view of the fact that the argument concluded with a distinct appeal to the jury to be guided by public opinion. It cannot be known that the remark made by the judge in disapproval of such applause would remove any impression that might otherwise be made to the defendant's prejudice on the minds of the jury.

*Henry E. McGinn*, district attorney, for the State.

The State contends first: In order for the defendant to urge as an objection on appeal the insufficiency of the evidence to justify the verdict, there must have been a request made to the lower court, a refusal by that court and a legal exception made then and there to such refusal. *State* v. *Clements*, 15 Or. 243; *Kearney* v. *Snodgrass*, 12 Or. 311. Second—Should the court be of the opinion that a different rule must prevail in capital cases, then the record furnishes abundant proof of deliberate and premeditated malice, from the fact of Weber waiting upon Sliter and requesting him to discharge Olds; from Olds waiting on the corner for Weber to come up to him; from the language used by Olds to Weber when they met; from Olds having his pistol in his front pant's pocket with his hand on it at the time of meeting; from all the circumstances of the shooting; from the language addressed to Weber's prostrate body after the killing, and from the additional circumstances that Olds was seen some moments before the killing near the place of the homicide. Testimony of M. C. Sullivan, page 51. *et seq.*; testimony of John Bose, pages 1 to 7; testimony of M. G. Griffin, pages 27 to 27½; testimony of Chas. Olds, page 182, *et seq.*; testimony of Chas. Sliter. pages 63 and 64

The testimony of Milton Weidler of what he stated to a friend when he heard of Weber's death, was nothing more nor less than a voluntary explanation made by the witness of a statement made by him inconsistent with his sworn statement; the witness having said on oath in court, "No; I won't swear I saw Olds that day," was explaining what lead him to say out of court, "I believe I saw Olds standing on the corner when I passed by." He undoubtedly had such right with or without an impeaching question being asked of him. Wharton on Ev. § 25; Wharton on Criminal Ev. § 13; Hill's Laws, 838 and 841; *Payne* v. *The State,* 60 Ala. 80; *Snell* v. *Gregory,* 37 Mich. 500; *Langford* v. *Jones,* 18 Or. 307.

The question asked of jurors, "Can you disregard the opinion (derived from reading the newspapers) and try the case on the law and evidence only?" was a proper question. Section 187 of Hill's Laws; *State* v. *Saunders,* 14 Or. 300; *People* v. *Casey,* 96 N. Y. 115; 1 Thompson on Trials, § 83. No juror was taken after the defendant exhausted his peremptory challenges who was unacceptable to him. Thompson on Trials, § 120.

Judge Stearns called in Judge Shattuck to pass upon the motion for a change of venue. The charges contained in the affidavit of the defendant were of such a character that it would have been highly improper for Judge Stearns to sit and hear the motion. However, the motion contained nothing entitling the defendant to a change of venue. *People* v. *Williams,* 24 Cal. 33; *People* v. *Shuler,* 28 Cal. 495.

The request of the defendant for certain instructions and the refusal of the court to give them was not error. Wharton's Criminal Evidence, § 10; and they were repeatedly given by the court. The applause in the court room at the conclusion of the argument for the State was promptly checked by the court and a reprimand given.

The argument of the district attorney was borne out by the testimony. As to how far the district attorney may go in argument, see *Pierson* v. *State,* 18 Tex. App. 524; *House* v. *State,* 19 Tex. App. 227; *Tucker* v. *Henniker,* 41 N. H.

317; *Cuss* v. *State*, 68 Ala. 476; *Hoyle* v. *State*, 109 Ind. 589; *State* v. *Hallen*, 75 Mo. 355; *Bulliner* v. *People*, 95 Ill. 394.

When no exception is taken to the remarks of counsel, such remarks cannot be urged in the supreme court for the first time as a ground of reversal. *State* v. *Abrams*, 11 Or. 172.

THAYER, C. J., delivered the opinion of the court.

This is the second time this case has been here; and the circumstances attending the second trial, and the whole affair, indeed, has been of such a character as to greatly embarrass the court in its determination of the questions involved. This court has no authority to review the determination of trial courts upon questions of fact where the evidence is conflicting; but it has authority to look into a case where there has been a criminal conviction, in order to ascertain whether there is evidence to support the conviction, and to ascertain whether or not the accused has had a fair trial. *State* v. *Hunsaker*, 16 Or. 497; *State* v. *Cody*, 18 Or. 506. Every person charged with a public offense whether guilty or not is entitled to a fair trial. "Because," as said by Mr. Bishop in 1 Criminal Procedure, § 10, "a guilty man has, by the law itself, a right to be acquitted, unless he can be convicted by virtue of the rules and methods which the law has itself provided." In order to insure such a trial, the constitution of this State, section 11 of article I, has provided: "In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed," etc. The securing to parties accused of crime a fair trial by an impartial jury, especially in capital cases, has ever been the solicitude of the common law. Blackstone says: "It was necessary for preserving the admirable balance of our constitution to vest the executive power of the laws in the prince; and yet this power might be dangerous and destructive of that very constitution if exerted without check or control by justices of *oyer and terminer* occasionally named by the crown,

who might then, as in France and Turkey, imprison, dispatch or exile any man that was obnoxious to the government, by an instant declaration that such is their will and pleasure. But the founders of the English law have, with excellent forecast, contrived that no man should be called to answer to the king for any capital crime, unless upon the preparatory accusation of twelve or more of his fellow subjects, the grand jury; and that the truth of every accusation, whether preferred in the shape of indictment, information or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbors, indifferently chosen and superior to all suspicion. So that the liberties of England cannot but subsist so long as this *palladium* remains sacred and inviolate; not only from all open attacks (which none will be so hardy as to make), but also from all secret machinations which may sap and undermine it, by introducing new and arbitrary methods of trial by justices of the peace, commissioners of the revenue, and courts of conscience. And however *convenient* these may appear at first (as doubtless all arbitrary powers well executed are the most convenient), yet let it be again remembered, that delays and little inconveniences in the forms of justice are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our constitution; and that although begun in trifles, the precedent may gradually increase and spread to the utter disuse of juries in questions of the most momentous concern." 4 Black. Com. (Cooley's Ed.) 350-1.

The importance of any immunity, however, does not depend so much upon constitutional guarantees as it does upon their observance and enforcement.

The violation of the spirit of the law is as pernicious in its consequences as the violation of its letter. The right of the accused in a criminal case to a trial by jury would be of little advantage if the jury had to come from a community biased and prejudiced against him by influences

which he was unable to countervail. Such a condition of public sentiment in a community renders it impossible, many times, to enforce a due administration of law; and it is often produced by the publication of intemperate newspaper articles. It is extremely unfortunate to the cause of justice that many of the newspapers of the country pursue the course they do with reference to cases of homicide. They seldom fail to designate the transaction as a murder, which of itself is a judgment, to the extent of newspaper jurisdiction in such matters, that the slayer is guilty of that crime without regard to the circumstances connected with it. And they usually publish not only a detailed hearsay statement of the affair, but decidedly indicate their own views regarding it. The result is, that by the time the accused is arraigned for trial, the reading portion of the community have generally formed and expressed an opinion concerning his guilt or innocence; which renders it very difficult to secure an intelligent and unbiased jury to try him by. In the case under consideration, the newspapers referred to in the appellant's petition to postpone the trial, and for a change of venue, assume, I should judge from the tenor of the articles made exhibits, to decide how the case should be disposed of. The publishers of those sheets appear to have established a tribunal of their own in which to try the accused; and in view of the extensive circulation of those papers, and their high standing as public journals, it is difficult to conceive how an impartial jury could be secured from the county where they are published, by which he could be tried, especially after two trials had already been had. Under these circumstances I cannot see why the trial court should have refused a change of venue. It is apparent, then, that a great proportion of those who would be likely to be summoned as jurors would be found to have formed and expressed an opinion as to the guilt or innocence of the accused; an opinion superinduced by the reading of the published statements of the witnesses examined on the former trial, and positive comments made by the publisher.

There were two questions in the case to be tried—First, was the accused justified in killing Emil Weber? Second, was there sufficient evidence in the case to show that the killing was done with such deliberate and premeditated malice as to constitute murder in the first degree? That Weber had been abusive and overbearing towards Olds, had made it a point to insult him whenever an opportunity presented itself, and that the latter submitted to it meekly except when assaulted by force, is clearly shown by the testimony. What the cause of Weber's animosity was does not appear except from the statements of Olds himself. He testified that he was born at Coldwater, Michigan; that he lived there until he was twenty years of age; that he went from there to Chicago, where he traveled two years for a wholesale house; that he then went to Colorado and from there to New Mexico; that in the first place he was in the contract business; that he built or was sub-contractor of five miles of the Atchison and Topeka railroad, the New Mexico branch; that he then went into the livery business at Las Vegas, New Mexico; that from there he went to Leadville, where he had his first experience at gambling; and after various perambulations, in May of 1883 arrived in Portland, where he had since resided; that he got acquainted with Weber when he first came to Portland, the latter having come there about the same time and kept a saloon and gambling house; that the first trouble accused had with Weber was in 1885; that it was over the city election; that they had been on opposite sides; that the next day after the election accused called at Weber's place of business and was refused admission into the gambling department, and that Weber used abusive language towards him and threatened to have him vagged; that accused said to him: "Mr. Weber, you have a big gambling house here, are worth plenty of money, and I am a poor man; of course you have that privilege"; that Weber told him not to come near his house any more, and that he did not go there again while he kept it; that it was closed about a year and a half after that, and he sold or leased it to other

parties; that in 1887 or '88 Weber undertook to indict the police, and accused was subpœnaed to appear before the grand jury; that Weber found it out and came and wanted to dictate to him what he should testify to; this he refused to submit to.

The accused then proceeded to describe minutely Weber's course of conduct toward him thereafter, which was bitter and malicious in the extreme; and which no doubt led to the commission of the homicide. It is evident from the testimony in the case that Weber aspired to be a sort of leader among the class with whom he associated. He may not have been a bad man at heart, and probably was respectful and courteous to his superiors; but he had accumulated property, and like many others, became insolent and arrogant toward those whom he regarded as his inferiors in position, when they opposed his views and wishes. His vocation was calculated to make him morose and irritable. He was engaged in an irrepressible conflict with the police force, was at variance with his own fraternity, and seems to have concentrated all his spite and wrath upon Olds; and after the latter had beaten him in the fist fight in which he, himself, was clearly the aggressor, he indulged in the numerous threats of violence against him shown in the testimony. These threats may have amounted to nothing more than bravado and swagger; but with such a man as Olds, who was of a taciturn and impressible temperament, and probably remorseful on account of the false and ruinous step he had taken in life, they appeared portentious; but whether or not he was justified in taking his life under the proofs in the case, was purely a question for the jury. The right either of the State or of an individual to take human life must be sanctioned by law. In the latter case it must appear that it was done to prevent the commission of a felony upon the individual, etc., as provided in section 1730, Ann. Code. The killing, however, if not justifiable, is not murder in the first degree unless done purposely and of deliberate and premeditated malice, or in the com-

mission or attempt to commit rape, arson, robbery or burglary; and there must be some other evidence of malice than the mere proof of killing to constitute murder in the first degree, unless effected in the commission or attempt to commit a felony; and the deliberation and premeditation necessary in such a case, must be evidenced by poisoning, lying in wait, or some other proof that the design was formed and matured in cool blood and not hastily upon the occasion. This is the effect of the provisions of the statute of this State upon the subject. Section 1727, Ann. Code. It therefore devolved upon the prosecution in this case, before the jury would be warranted in finding the accused guilty of murder in the first degree,—there being no pretense that the killing was done in the commission or attempt to commit a felony,—to prove facts aside from the fact of the killing, the direct and legal tendency of which was to establish that Olds in cool blood formed a design to kill Weber and that the killing was done in pursuance thereof. It is not enough in such a case to prove circumstances from which inferences might be drawn that the design was so formed, as the statute requires that either the mode of the killing is of a character that it, of itself, proves deliberation and premeditation, such as poisoning, or that some special proof of a distinct fact be made, such as lying in wait.

It is claimed by the learned district attorney, that, from the evidence, Olds gave Weber the beating referred to; that Weber called upon Sliter and informed him that Olds could no longer continue to run the game he was then running over the Crystal Palace saloon; that Sliter informed Olds of this and requested him to leave the city for awhile; that Olds walked up Third street to the corner of Alder, where he met Weber, and the killing was done as described in the testimony for the State, and the various circumstances transpired as therein mentioned, it clearly appeared that Olds killed Weber for the reason that the latter had been hunting around town for him, and for what he had said to Sliter. The several points in the testi-

mony which the district attorney urged at the hearing
with great force, as evidence that Olds had in cool blood
formed the design to kill Weber, were important matters
of proof in the case, but that they were sufficient to estab-
lish that Olds was *lying in wait* to commit the homicide,
cannot be maintained. "Lying in wait," according to
Bouvier, is "being in ambush for the purpose of murdering
another." It implies a hiding or secreting of one's self.
It could hardly be claimed that a person walking on a
public street in broad daylight in a populous town was
lying in wait. I do not think, however, that the statute
requires proof that the slayer in such case was secreted;
but it requires proof of some fact, aside from the killing,
showing that it was done in pursuance of a previous design.
Olds having gone to the place of the homicide in the
manner he did, and under the circumstances existing
between himself and Weber, was no stronger proof that he
went there to slay Weber than it would have been that
Weber went there to kill him if he had been the slayer.
It was not pretended that Olds had ever made threats
against Weber or evinced any intention whatever before
the time of the fatal meeting to commit violence upon
him; he seemed to acquiesce in Sliter's suggestion to leave
town, and never, so far as appears from the testimony, did
he breathe a breath of vengeance, or even utter a word of
complaint. Nor does it appear that Olds had any expec-
tation of meeting Weber on that day; he had, in fact, been
trying to avoid such meeting; upon the night previous,
according to his own testimony and that of Richter, he
remained up stairs until a late hour to keep clear from
him; and apprehensive that the latter might be lying in
wait to do him bodily injury, went a long distance towards
his stopping place between Richter and Lynch. Again,
if Olds had intended to murder Weber, had planned to
take his life, he would not have been likely to have chosen
the time and place where the killing was done to execute
his purpose

It was vehemently contended by the district attorney in

XIX. OR.—28.

his address to the jury, that the gamblers in Portland were at the bottom of the affair; that they had compassed the death of Weber, had employed Olds to carry out their design, and raised money to clear him and defeat the ends of justice. And he strongly intimated that the police force of the city had lent its aid and influence to further the scheme. The following extracts from the remarkable address will show the position which the district attorney occupied at the trial respecting that feature of the case:

"Men of Multnomah county: Will you stand forth and say, that because these men have sent forth the ukase that Weber should die and that the man who killed him should be defended by their money and influence and by their power and by their perjury—do you mean to say that because they have decreed the sacrifice, that you will execute their behest?" "But Weber had made an effort to quit that business and get into a business lawful and legitimate, and because he did so he was murdered,—because he attempted to stop the wheels of the chariot of King Faro and King Poker, driven by Gratton and Sliter and Olds. I don't know what his motives were. They may have been selfish; but grant it; he was undertaking to suppress something that was against the law; and because he told them he would do it, they killed him and shot him down, and they are now rallying around the standard of their twin brothers, King Faro and King Poker." "Is it not a shame and a disgrace that men who are on the police force of the city of Portland are able, day after day, to patrol their beats, knowing the existence of gambling in this community, knowing where it is, knowing its devotees, conversing with its devotees, walk calmly and placidly into a court of justice, raise their hands to the tribunal of God, when that same hand had formerly been raised to support and sustain the law, and take an oath that these men with whom they associated,—gamblers, all of them,—that Weber's character was bad and Olds' character was good. Gentlemen of the jury, I submit these facts to you; I state the facts. You draw

your own conclusions." "Was this case to be prosecuted, or was it a case for the public prosecutor to come into court and say: 'Most grave, reverend and worthy senior Olds, my most approved good master, led by Vernon and led by Gratton and the balance of your kind, I apologize most humbly to you, I crave your humble pardon. It is true that you were armed with a deadly weapon; it is true that you stopped a man on the streets; it is true you sat on the fire-plug and waited for him; it is true that you were waiting there with your hat over your eyes, with your eye turned toward Second street waiting for him to come; it is true that Sullivan and Col. Weidler saw you there; but my dear good fellow, the police say you are a good man, and I know you must be a good man or they would not say so. Go thou and enjoy the peace of the land, King Faro and King Poker, and the balance of the kings, that go to rob manhood and womanhood of its honor and integrity.'" "I repeat again that Emil Weber, dead, is a grander character in my judgment, is a grander character in the judgment of every law-abiding citizen of this county, is a grander character to day with the hand of every one of these scoundrels against him in court, than he would be living with every one of them for him. O, for a new Christ that would enter this temple of justice to day, saying as of old, 'My house is a house of prayer, but you make it a den of thieves.' *That is what they would do with this court-house; they have commenced to undermine the foundation of justice; they have raised a sack;* the cry has gone forth; Seattle has been rallied, Tacoma has been rallied, Spokane has been rallied, and with Portland gamblers have joined hands to defeat the ends of justice and to let this gambler go unwhipped of justice in order that King Faro may rule, and that every man may be deterred from undertaking to stop him in his course." "Gentlemen, this case is now with you. The people will not be deceived; they cannot be deceived; they know where the right is, and you know where the right is, too. You know the element that are to day contesting in this court for supremacy. You know

that on the one hand is law and order, and on the other hand is riot and bloodshed and disorder. You know that those two things are trying to gain the supremacy in this county. You know that one or the other will rule. If Charles Olds is allowed to go forth with your verdict registered one iota less than charged in this indictment; if it is said of him that he did not commit deliberate and premeditated murder, the shout will go forth to Spokane, the shout will go forth to these various places that Multnomah county juries will not convict gamblers, when they are clearly proven to be guilty; that Multnomah county juries will not do their duty in this regard, but that they will shirk it." "Can anybody dispute it? Has it not come to be, as I said, a by-word and a reproach that in the administration of the criminal law in these United States of America, the murderer frequently goes free?" "Unfornately is it not found that there are jurors who do not do their full duty? *Because you know the tactics of the gambler,* the State needs twelve jurors to convict, and he only needs one. That is the test that is what has brought jurisprudence in this country into disrepute. That is what has caused the legislatures of various States to pass laws to try, if possible, to execute laws and to prevent money and power and wealth from impeding and stopping the goddess in dealing out her even-handed justice to all."

These are only a few excerpts from the address and were not all taken in the order in which it was delivered; but they are a faithful index to its tenor and spirit. It was a remarkable diatribe; it was a powerful invective against the gambling class, a severe criticism upon the police of the city, and also, indirectly, a damaging reflection upon the officers charged with the administration of the criminal law of the county. The eloquent attorney seems to have occupied the position of Samson when he pulled down the temple of Dagon on the heads of the Philistines, "and it fell upon him also." If the assumption that the attorney indulged in, that the gamblers of Portland had conspired to take Weber's life and Olds

shooting him was a part of the conspiracy, could have been sustained it would have established the latter's guilt of the crime charged in the indictment beyond any question; but when he appeared in this court and attempted under the evidence to justify the verdict of murder in the first degree, he was unable to point out wherein it supported the assumption to any extent whatever; and there seemed no other excuse for his engaging in such extraordinary hyperbole than an excess of zeal bordering on frenzy. The proof, however, showed that some of the witnesses on the part of the defense were gamblers, and that they had assisted to raise a sum of money to aid Olds in his defense, which of course tended to impeach their testimony. The claim of the district attorney that the gamblers had conspired to take Weber's life and raise a fund to secure Olds' acquittal and corrupt the foundation of justice, seems to have been predicated, in the main, upon the testimony elicited from Thomas Williams on his cross-examination. The witness had testified as to threats made by Weber against Olds, and in regard to Weber's bad character and Olds' good character. It appeared that the witness, among other occupations, had been engaged in the gambling business. He also testified that he had taken a good deal of interest in the case, had raised money for the defense amounting to about three thousand dollars, about half of which he contributed himself; that he visited Seattle and Tacoma, and had written to Spokane Falls in the interest of the accused. Upon his re-direct examination he was asked to state the reason why he took this interest in Olds, and he answered: "Simply because he asked me to. He sent for me after this man was killed; I guess I was the first man that saw him, and I think I was about the only gambling man in the town at the time. He sent for me, and I went to the city jail to see him, and he told me what had happened, and he says: 'I haven't got a quarter; will you do what you can for me?' I told him I would, and I made my word good as near as I could." The witness further testified that he had been feeding

Olds while he was down stairs, sending his meals to him. The harangue of the district attorney to the jury was highly sensational, and served, no doubt, to incite their passions and prejudice against the accused; but, unless justified by the evidence, was quite out of place. The trial of a fellow-being for murder, where the penalty is death, devolves a grave responsibility upon the attorney for the State as well as upon the court and jury, and a conviction should never be urged unless justified by the proof, fairly weighed and considered. It is to ascertain the truth and apply the law, and a resort to imagination or fancy in order to incite the passions and prejudices of the triers, is a deviation from the true and proper course. To convict and put to death a human being through the influence of prejudice and caprice is, morally, murder, and more pernicious in its consequences, by far, than the escape of a guilty person; and the forms of law should never be prostituted to such a purpose. It is claimed by the counsel for the State that the manner of the accused when he did the shooting, and the language made use of by him, showed deliberation and premeditation. But I do not think that what he did or said on that occasion proves that he had previously designed to take the life of Weber. His having the appearance of being cool, his firing the number of shots he did and the remark he made after Weber was killed were acts as liable, or even more so, perhaps, to attend upon a hastily-formed design to kill, as upon one formed in cool blood. Said counsel also claims that as the trial court was not called upon to make any ruling regarding the sufficiency of the evidence to warrant the conviction of murder in the first degree, no question can therefore be made upon that point in this court; that the question must be raised there before it can be considered here.

It has been held repeatedly by this court that it had no authority to review the decision upon a motion for a new trial; and has been indicated very strongly a number of times that the question as to the sufficiency of the evidence

to support the judgment or conviction, must have been first passed upon in the trial court. But whether that rule should be adhered to in a capital case has never before, that I am aware of, been pressed upon the attention of the court. I have always been of the opinion, since my attention was called to the matter, that where the evidence in a capital case is shown to be clearly insufficient to warrant a conviction, it would be the duty of this court, under its supervisory power over the circuit courts, to reverse the conviction and order a new trial. If, for instance, a case were brought here where the accused had been convicted of murder in the first degree and the evidence showed affirmatively that the *corpus delicti* had not been proven, we could not, it seems to me, affirm the conviction. The counsel for the appellant cites in his brief a number of decisions from the courts of other States to the effect that the appellate court will not apply in capital cases the rules which govern trial courts in other cases with the same strictness, and I am of the opinion that such a rule should obtain here. I think it the duty of a trial court, at all events in a case of murder, where the evidence is not sufficient to warrant a conviction of the highest grade of the offense charged, to instruct the jury of its own motion to that effect. "It is," says Blackstone, "the noble declaration of the law that the judge shall be counsel for the prisoner; that is, shall see that the proceedings against him are legal and strictly regular." Black. Com. (Cooley's ed.) * 354.

I have thus far omitted any reference to the testimony of the witness Milton Weidler contained in the statement herein. The district attorney seemed to rely upon this testimony, in his argument to the jury, as proof that Olds was lying in wait to kill Weber, as it appears in one of the extracts from his speech above set out. That testimony, however, was clearly incompetent, as the witness would not swear that the man he saw standing by the fire-plug was Olds, and could not describe the man further than that he was a heavy-set man, and the court committed palpable error

when it allowed the witness to testify to what he said to his friend as to his belief that Olds was standing on the corner when he passed. If the witness had seen Olds standing at the place at the time referred to, his testimony to that effect would necessarily have been damaging to the accused; but he could not swear, nor describe the man he saw so that he could be identified as Olds. He should not, therefore, have been permitted to eke out his evidence on that point by testifying to the expression he made use of when he heard the announcement that Olds had shot Weber, regarding his mental impression that the man he saw standing on the corner was Olds. It was a mere surmise on the part of the witness, yet admitting it in evidence under the particular circumstances was highly prejudicial to the accused.

There are other questions in the case which have been discussed, but it is not necessary to specially consider them. The counsel for the accused had the right to have the two instructions requested by them given in some form to the jury; whether they were included in the instructions given may be questioned, but the solution of that question is not necessary to the decision of the case, and probably will be obviated in the future.

After a thorough examination of the facts in the case, I am constrained to believe that the accused has not had such a trial as the law accords to parties charged in capital cases. That he is a gambler and a worthless member of community, may be true; but he is on trial for his life, is within the pale of the law, and the courts can do no less than to require that the law be administered in his case as in all others—in accordance with its letter and spirit.

I am of the opinion that the judgment of conviction should be reversed and the case remanded for a new trial.

LORD, J. dissenting.—Upon the points discussed, my views are briefly these:

First—That an opinion formed from newspaper reports does not disqualify a juror when it is such as will yield to the evidence which may be adduced, and it appears that he

can give the defendant a fair and impartial trial; that "all men," as Butler, C. J., said, "take newspaper statements as current news, liable to qualification, explanation or contradiction, and when qualified, explained or contradicted, they change their opinions or belief accordingly as a matter of course"; so that the opinion which should exclude a juror must be of a fixed and settled character; showing that his mind is not open to the reception of testimony and partaking, in fact, of the nature of a prejudgment, and finally, that the trial court has a better opportunity to judge of the juror's fitness and competency upon the whole examination conducted in its presence and hearing, than can the appellate court from a bare inspection of the record alone.

Second—That the motion for a change of venue on account of prejudice alleged to have been produced in the public mind by exaggerated newspaper reports that would prevent the defendant from having a fair and impartial trial, controverted by counter-affidavits on behalf of the State to the effect that the accused could have a fair and impartial trial, and that a jury could be selected from the body of the county, was addressed to the discretion of the trial court, and is not reversable error, except for manifest abuse and injustice; that the books abound in cases which show upon applications of this kind, that where, soon after the killing, false and exaggerated statements are alleged to have been published concerning the transaction in newspapers of general circulation in the county, and that these publications reflected severely upon the defendant's character and greatly inflamed the public mind and prejudiced the people against him, controverted by affidavits on behalf of the State to the effect that the affiants were acquainted with the feelings and sentiments of the people, and that no excitement or prejudice existed against the defendant which would prevent him from having a fair and impartial trial; that such applications are addressed to the discretion of the trial court, and refused to interfere, and that, except in special cases, any interference of the appellate

court is more likely to result in a failure of justice than in depriving the accused of a fair and impartial trial.

Third—That this court cannot review, as has been done in this case, the determination of the trial court upon a motion to set aside the verdict on the ground of the insufficiency of the evidence, because (1) such motion is not reviewable in the appellate court, and that it has been its constant practice from *State* v. *Fitzhugh,* 2 Or. 230, to *State* v. *Clements,* 15 Or. 243, in which THAYER, C. J., said, as to the identical point now raised: "This court long ago held that a matter [motion to set aside the verdict] of that character is not reviewable. Counsel, however, continued, from time to time, to persist in urging such questions upon the consideration of this court, and seem to think that unless they are able to raise them, judgments are liable to be given without sufficient evidence in law to sustain them. But such results are not liable to follow if counsel will properly present them. This court will not uphold a judgment where the evidence is not sufficient in law to justify its rendition, *if the question is properly made, which can be done by a motion at the trial to discharge the defendant upon that particular ground and including all the evidence in the bill of exceptions tending to establish his guilt.* So, also, a question regarding the sufficiency of the proof of a particular fact in the case may be reviewed here, but it must be raised by an exception at the trial. Should the trial court say to the jury that if they found such and such facts, and there was not sufficient evidence in law to authorize such finding of all or any of the facts thus submitted, an exception in either case could be saved and made available. All the evidence, however, would have to be certified to this court, bearing upon the same, in the statement of the exception; and the statement in such case must purport to contain all the evidence upon the point. *This court has nothing to do with the rulings of the trial court upon a motion for a new trial or to set aside the verdict of the jury. It deals only with questions of law, and they must be squarely presented as such.*" Because (2) the rule as thus

declared and steadily maintained is better adapted to protect all the legal rights of the accused, and to meet the ends of justice by presenting the particular matter or point, as here, the fact of premeditation and the evidence in respect to it alone, so that the appellate court can examine and pass directly upon it without wading through a voluminous mass of other matter about which there is no controversy. Because (3) the determination of the trial court cannot be reviewed for the reason, as Story, J., said, that "it is not a matter of absolute right in the party, but rests in the judgment of the trial court, and is to be granted only when it is in furtherance of substantial justice; but that the case is far different, upon a writ of error, bringing the proceedings at the trial by a bill of exceptions, to the cognizance of the appellate court. The directions of the trial court must then stand or fall upon their own intrinsic propriety as matters of law." As such rule is operative to prevent a judgment without sufficient evidence in law to sustain it, it ought to stand and its reversal will be apt to needlessly multiply new trials, and perhaps to cause a failure of justice. Because (4) that the cases referred—*State* v. *Cody*, 18 Or. 506, and *State* v. *Hunsaker*, 16 Or. 497, —are not authorities to look into the case and pass upon the sufficiency of the evidence upon a determination of a motion of this character; but that the first, *State* v. *Cody,* was brought to the cognizance of the appellate court upon an exception to the trial court's refusal to direct a verdict for the defendant and that he be discharged, or that the court instruct the jury that the defendant could not be convicted of the crime of mayhem, for that the evidence was insufficient to justify the same, and not for the refusal of the trial court to set aside the verdict; and in the other, *State* v. *Hunsaker*, while STRAHAN, J., expressed his personal opinion to that effect, the court did not decide and he expressly added: "But we do not consider or decide that matter now." So that there is not only no authority in our practice to justify it, but the rulings, as already shown, have been constantly the other way.

But if these precedents are to be disregarded and overturned to meet the exigency of the case at bar, and the evidence examined upon a motion for a new trial after verdict, then (5) my contention is, that there is evidence, disclosed by the record, of facts and circumstances tending to show premeditation; that the evidence shows that the parties had had a previous quarrel and fight; that afterwards, and upon the day of his death, Weber called upon one Sliter and told him that the defendant Olds could no longer continue to run the game over the Crystal Palace saloon, and that Sliter communicated this information to the defendant Olds, and requested him to leave the city; that Olds walked up Third street to the corner of Alder, and that at the time he was armed with his pistol in his right-front pants pocket, and that he had his hand on it, and there met Weber and said to him: "I hear you have been about town looking for me?" and, before Weber could make full reply, commenced firing, and after shooting four bullets into him, after his victim lie dead, or dying, at his feet, threw back his coat, put in his revolver, then took out his handkerchief and calmly took off his hat, wiped his brow, wiped his hat, walked around the body, and before leaving saying, "Now, you s— of a b—, you have got me!" tending to show that his mind was made up to answer his own inquiry in the way it was done before Weber could reply.   One witness, when asked, "What time would you say elapsed between the time Olds addressed the remark, 'Mr. Weber, I understand you have been looking for me,' until he fired the shot?" answered that "it was almost instantaneous," and that Weber had hardly completed his reply, "You s— of a b—, what do you want with me?" when the first shot was fired, tending to show that the question was not asked to elicit an answer, but that it was asked and followed so instantly by pistol shots as tended to indicate that the purpose to take Weber's life was already formed when it was done.   When all the facts are taken together—the fight which had preceded; Weber's conversation with Sliter, which he had

imparted to the defendant Olds, and which indicated a
purpose to break up his gambling game; Olds going
armed to the corner of Alder street, his stopping there,
and when Weber came along addressing to him an inquiry
that tended to show that what Sliter had told him was
then in his mind, but followed so quickly by pistol shots
as tended to indicate that no reply was expected, but that
he was executing a purpose already formed, and his
manner after the killing, so comparatively free from
excitement or passion, deliberately putting back his
revolver into his pocket, calmly wiping his brow, his hat,
and walking about his victim—leaves him with the remark:
"Now, you son of a b—, you have got me"; or, as the facts
would seem to tie together, you have been looking for me
and now you have got me, tending to indicate a state of
mind that was not acting on the impulse of the moment,
but exercising a purpose already formed with deliberation
to insure certainty in its results.

It may be that there is testimony of other witnesses
which would contradict this, or from which different infer-
ences may be drawn, or which would tend to support some
other theory, or from facts admitted and even undisputed
as to what is the proper deduction, where different men
equally sensible and impartial would make different
inferences, but that only serves to show that the law com-
mits the case to the decision of the jury and not the court.
For, in passing upon the sufficiency of evidence by a court,
"it must be assumed," said Judge Dillon, "that all the
evidence in the case is true, and that the witnesses are all
credible, for if there are questions relating to the credi-
bility of witnesses, or if what the evidence proves depends
upon the credibility of witnesses, or upon the proper
deduction to be drawn from the evidence, these are ques-
tions not for the court but for the jury under the direction
of the court." That rule applied to the evidence disclosed
by this record makes this a case for the decision of the
jury and not for the court, as it is their province to decide

questions of fact, as it is of the court to decide questions of law.

Fourth—That the testimony of Weidler is merely cumulative, and that there is sufficient evidence to support the verdict without it, and therefore, its admission, conceding it to be incompetent, was without prejudice and is not reversible error.

Fifth—That the remarks attributed to the district attorney as improper and inserted in the record, were not excepted to and brought to the attention of the trial court for its decision, and cannot now be raised for the first time in this court within the ruling and decision in *State* v. *Abrams*, 11 Or. 172, in which Watson, J., said: "Some of the remarks attributed to Mr. Dorris were undoubtedly improper and can hardly be condemned with too much severity. But however reprehensible, there is one insuperable obstacle to their being considered here as ground for reversal—they involve no error in the court below. We have announced this principle before. *State* v. *Anderson*, 10 Or. 448, and we now lay it down as a rule, *to which there is no exception*, that no objection to proceedings in the court below can be heard in this court which is not based upon alleged error in judicial action on the part of the lower court."

In view of these considerations, much as I regret to differ with my associates, as I understand the law and the practice so long and steadily adhered to by this court, I cannot consent to disregard and overturn them, and have, therefore, no other alternative than to dissent.