Argued October 18, affirmed December 24, 1918.

# STATE *v.* STICKEL.

(176 Pac. 799.)

**Larceny—Evidence—Identity—Admissibility.**

1. In a prosecution for cattle theft, where it appeared that defendant rode a gray horse, *held*, under the circumstances, that witnesses who lived where they would probably have seen defendant going to the corral of the prosecuting witness might testify they saw two men riding gray horses, though they did not recognize them.

**Criminal Law—Instructions.**

2. The refusal of requested instructions covered by those given is not error.

**Criminal Law—Request Covered by Instructions.**

3. In a prosecution for the larceny of cattle, refusal of defendant's requested instructions that, before the jury could convict they must believe defendant was guilty of or in complicity with the original taking, *held* not erroneous; the instructions given presenting the same theory.

**Witnesses—Credibility—Conduct of Witness.**

4. In a prosecution for cattle theft, where defendant asserted an *alibi*, a witness testifying to seeing defendant under such circumstances as to corroborate that contention might be cross-questioned as to whether he did not testify at the preliminary examination of one also charged with the offense with whom he was on good terms, it appearing that such witness, who did not testify at defendant's first trial and lived in the vicinity, did not inform defendant of the matter until subsequently, etc.

[As to the impeaching witnesses, see note in 14 Am. St. Rep. 157.]

From Lake: L. F. CONN, Judge.

Department 1.

Vernon Stickel appealed from a conviction of the larceny of 23 head of cattle belonging to Andrew Keister. About 1 o'clock in the morning of August 25, 1917, Andrew Keister was awakened by "a terrible racket" made by the 71 head of cattle kept by him in a field about 80 rods east of his house. His "hay corral was in a bad condition" and he went to see "what was the trouble." He could "hear cattle bawling and

raising a fuss on" his south line; but he did not "know what the trouble was until the next morning" when he "started to hunt" his cattle and discovered that one bull, ten heifers and twelve steers were gone. The three principal places to be kept in mind are: the Keister ranch, the place where Stickel was arrested and Clover Flat. The Keister ranch is about seven miles northwest of Lakeview. The frequent use of the words "here," "there" and "this" by witnesses when pointing out places shown on a map makes it difficult to tell whether the place where Stickel was arrested is a part of the Martin homestead or a portion of the Bishop ranch or merely an inclosure adjoining the homestead or the ranch; and therefore for the sake of convenience we shall refer to the place where Stickel was arrested as "the clearing." Wm. Bishop lives "north of Lakeview, about twelve miles north and a little west"; Bishop's house is about three quarters of a mile south of the clearing and hence the place where Stickel was arrested is about thirteen miles northwest of Lakeview. Clover Flat is "about twenty-two or twenty-three miles north of" Lakeview. L. P. Mauzey conducted a ranch on Clover Flat and had cattle running on the range. Stickel was an employee of Mauzey and rode the range for cattle and did such other work as Mauzey directed him to do. "By the way you ordinarily ride" it is about "twelve or fourteen miles" from the clearing to the Mauzey ranch. The route traveled by the cattle in going from the Keister ranch to the clearing was "between twelve and fifteen miles"; it was not a direct route; it was "a pretty hard drive, * * because there were no trails or roads for them to follow. The cattle were tracked from the Keister ranch to the clearing. The evidence for the state was to the effect that when Snider, the

sheriff, Rinehart and Keister came upon Stickel in the clearing the latter attempted to escape, but the brush, into which the defendant rode his horse, was so thick that he could not get away. When asked about the appearance of the cattle when found in the clearing Keister stated that they "looked like they had been driven hard for several hours." P. W. Hotchkiss, a cattleman, expressed the opinion that it would take "the biggest part of twelve hours" to drive "that bunch of cattle" over the route traveled from the Keister ranch. Stickel was apprehended about noon. The sheriff testified that Stickel's horse "had been ridden hard, you could see, by the appearance of the horse and the way it acted." The sheriff also told the jury that Stickel "appeared to be pretty tired and sleepy; that was his appearance to me that day, and all that day." When arrested Stickel was wearing a heavy mackinaw coat and a pair of shaps, although it was a "very warm day"; it was sultry. Upon searching Stickel a flash-light was found in a pocket of the mackinaw. The witnesses who trailed the cattle stated that they could tell from the tracks that two horses had followed the cattle; that one horse was shod and the other barefooted. The horse which Stickel had been riding was shod and it was led beside the tracks made by the shod horse which had been following the cattle, and five witnesses gave testimony from which the jury could have found that all the shod horse tracks were made by the same animal. Even the defendant himself, who was present when the comparison was made, testified that the tracks compared favorably.

John Metzker, who lives about a mile west of the Keister ranch, says that sometime during the morning of August 25th "a bunch of cattle came by" his ranch and that there were "two fellows with them with"

90 Or.—27

gray horses. On August 16th Stickel and Mauzey were in the neighborhood of the Keister ranch and each was riding a gray horse. Stickel was riding a gray horse when arrested. Mauzey owned two gray saddle-horses. In company with Stickel and two others the sheriff rode to the Mauzey ranch at sometime in the afternoon of August 25th. Mauzey was not at home. When the sheriff went to the barn he found that "the hogs were locked up"; and when Stickel "opened the gate they all came running out of the barn and down into the field." The state claimed that this evidence tended to show that the hogs had been locked up in the barn for a considerable time. The sheriff then examined a gray saddle-horse on the Mauzey ranch and found that the horse "had sweat on, under the saddle, where the blanket had been." This horse, however, upon examination, was found to be shod. It is appropriate to state in this connection that there was testimony in behalf of the defendant showing that both gray saddle-horses owned by Mauzey had been shod on August 16th. On the evening of August 25th Wm. Bishop, who owns the Bishop ranch, and Frank Wilson, a neighbor, "made a trip over to Cox Creek, over near the Cox place and out to the county road and up a little distance" and while "traveling in a rig" when it was "getting a little dusk" they met Mauzey riding a gray horse. Speaking of the incident, Bishop testified that when Mauzey "saw us he started to leave the road, reined his horse off, and looked at us, and came back alongside of the road" and that Mauzey pulled out of the road "a matter of thirty feet" or more. Frank Wilson testified that when they met Mauzey, "he was riding north at the time, towards Clover Flat."

Stickel claimed that in the afternoon of August 24th he and Mauzey saddled their horses and "went up past Mill Flat and got a steer and went back home"; that they returned to the Mauzey ranch with the steer "between sundown and dark"; that they stayed at the Mauzey ranch "on the night of the 24th"; that on the morning of August 25th Mauzey and Stickel saddled the gray horses and rode together as far as Little Mill Flat where they separated. Stickel testified that Mauzey had contracted to sell some steers and dry cows and that they were riding the range for the purpose of gathering Mauzey's cattle. The defendant also told the jury in substance that just before he came upon the cattle in the clearing he saw two horsemen and when he started to catch up with them they rode away from him, leading him to believe that his presence was not wanted; that he came upon the cattle in the clearing and rode among them for the purpose of ascertaining whether any of the animals belonged to Mauzey; that he "didn't recognize Mr. Snider or Mr. Rinehart" when he first saw them approaching the clearing and, because of the suspicious actions of the two horsemen whom he had previously seen, it was his "idea to run in the brush and scout around and see what was doing."

The assignments of error relate to the admission of evidence, and the refusal of the court to give two instructions requested by the defendant.    AFFIRMED.

For appellant there was a brief over the names of *Messrs. Batchelder & Combs,* with an oral argument by *Mr. Charles H. Combs.*

For the State there was a brief over the names of *Mr. George M. Brown,* Attorney General, and *Mr. T. S.*

*McKinney,* District Attorney, with an oral argument by *Mr. Brown.*

HARRIS, J.—1. Charles Gotcher and Bill Burch were "at the Cox place" on the evening of August 24th and about dusk they saw two men riding gray horses. When the witnesses first saw the horsemen the latter were going east, but when a little over a quarter of a mile from the witnesses the horsemen "turned around the corner of the fence" and rode "south towards Lakeview." Neither of the witnesses was able to identify the horsemen and it is therefore contended by the defendant that it was error to permit the witnesses to testify about seeing these two horsemen. The Cox place is near the Bishop ranch and hence not far from the clearing. When we remember the relative locations of the Mauzey, Cox and Keister ranches, and when we remind ourselves of the testimony given by the several witnesses concerning two gray horses it is at once apparent that the testimony given by Gotcher and Burch was competent. The facts in *State* v. *McPherson,* 70 Or. 371, 375 (141 Pac. 1018), and *State* v. *Olds,* 19 Or. 397, 439 (24 Pac. 394), relied upon by the defendant, are dissimilar to those we are now considering; and hence those precedents have no application here. The circumstance that two horsemen were seen riding two gray horses at the time and place when seen by the two witnesses was competent when considered in connection with the other evidence concerning gray horses.

2. The defendant complains because the court refused to give requested instructions Nos. 1 and 4. Requested instruction No. 1 is as follows:

"I instruct you that larceny is the unlawful taking, carrying away or driving away the property of another with the intent to deprive the owner thereof. I

further instruct you that in this case when the cattle
in question were driven from the field of the owner
with the intent to deprive him thereof, the crime of
larceny was completed.''

Requested instruction No. 4 reads thus:

''Before you can convict this defendant, you must
believe beyond a reasonable doubt, that he is guilty of,
or in complicity with, the original taking, and any sub-
sequent connection after the taking would not be lar-
ceny in him whether in good or bad faith; and if you
believe that this defendant came into possession of the
cattle in question after the felonious taking, whether
in good or bad faith, he is not guilty of larceny and you
must acquit him.''

The charge which the trial judge gave to the jury
completely covered the first requested instruction and
it was therefore not error for the court to refuse to
repeat what he had already told the jury.

3. After enumerating all the material allegations
contained in the indictment, and explaining that it
was necessary for the state to establish the truth of
the material allegations beyond a reasonable doubt,
and after saying that larceny is the felonious taking
of the personal property of another with the intent to
deprive the owner thereof, the court gave the follow-
ing instruction:

''Felonious intent means, without the color of right
in taking, and to make the taking of property feloni-
ous, the taking must be such, and accompanied by such
circumstances, as to show a felonious intent, that is,
an intent to steal the property, and before a defend-
ant can be convicted on a charge of larceny, it must
be proven, beyond a reasonable doubt, that he was
guilty of, or in complicity with, the original taking of
the property charged to have been stolen.''

The matter contained in the requested instruction
appears in the instruction given by the court; and an

examination of the entire charge makes it obvious that the jury understood the theory of the state and the theory of the defendant and that the jury was advised and knew that the defendant could not be convicted if he did no more than merely to ride among the cattle in the clearing for the purpose of discovering whether any of them belonged to Mauzey.

4. H. Hopkins was called as a witness for the defendant and, after testifying that he resided at Clover Flat and that he was acquainted with Mauzey and the defendant, he stated that on August 24th he was running a header on the Jack Barker farm at Clover Flat and in the evening when returning from work to his home he came in sight of Mauzey and Stickel, each of whom was riding a gray horse, and that they were "driving a cow of some description." Hopkins explained that Mauzey and Stickel were off about two hundred yards and that he saw "them for a little bit and then they went out of sight in the timber." On cross-examination and in response to the question "You are very friendly with Louis Mauzey, are you not?" he answered, "On good terms"; and then over the objection of the defendant the following question was asked:

"Were you not a witness for him in the preliminary examination of the charge of larceny against him?"

The witness answered, "I was."

Hopkins was not called as a witness until after Stickel had testified in his own behalf and after Mauzey had appeared as a witness for the defendant. Stickel had explained that he and Mauzey had driven a steer to the latter's ranch on the evening of August 24th; Mauzey had corroborated Stickel by telling the jury that at some time after 2 P. M. on August 24th they saddled their horses "and came up over the top

of the mountain, down to this side and got a steer that
belonged to me, and took him home," arriving home
"about dark, between sundown and dark, but I
think almost dark"; and it is therefore manifest
that the testimony given by Hopkins about see-
ing Stickel and Mauzey "driving a cow of some
description" was highly important to the defendant,
because it tended to corroborate defendant's claim
that he was at Mauzey's ranch on the night of August
24th, and it also tended to neutralize any damaging in-
ferences that might be drawn from the testimony of
Gotcher and Burch since, on account of the distance
between the Cox and Mauzey ranches, Stickel and
Mauzey could not have been the persons who were
riding the gray horses at the Cox ranch if they were
in truth driving an animal as narrated by Hopkins.
The only material information given to the jury by
Hopkins on his direct examination was his testimony
about seeing Stickel and Mauzey on the evening of
August 24th. If the purpose of the question asked
Hopkins was to discredit Mauzey by showing that he
had been arrested, then the testimony was incompe-
tent; but it does not necessarily follow that the evi-
dence was incompetent for all purposes: *State* v.
*Farnam,* 82 Or. 211 (161 Pac. 417, Ann. Cas. 1918A,
318). The quoted question and answer, which were
objected to by the defendant, were followed by two
other questions and answers and then the cross-exami-
nation continued as follows:

"Q. Did you see Mr. Mauzey at the time Mr. Stickel
was arrested, at the time of his preliminary examina-
tion?
    "A. I saw him, I think I saw him at a distance.
    "Q. Did you have any conversation with him?
    "A. I don't remember that I did.

"Q. Did you have any with him, between that time and the time of the first trial of this case?

"A. I don't remember I had any conversation with him.

"Q. You didn't inform him, or this defendant, of this piece of information that you saw them on this day, until when?

"A. I think after the trial.

"Q. After the first trial?

"A. Yes.

"Q. Were you present during the first trial?

"A. No, sir."

In other words, notwithstanding the fact that Hopkins was a witness for Mauzey at the latter's preliminary examination, and in spite of the circumstance that he saw Mauzey at the time of Stickel's preliminary examination, and although he lived at Clover Flat, nevertheless Hopkins did not inform Mauzey or Stickel of having seen them on the evening of August 24th until after the first trial of Stickel. The jury did not agree at the first trial of Stickel. The fact that Hopkins delayed in telling Mauzey or Stickel about having seen them on August 24th was a circumstance which the state had the right to submit to the jury to be considered by the jury in determining the weight and value of the testimony given by Hopkins, and hence it was competent to ask Hopkins whether he had been a witness for Mauzey at the latter's preliminary examination.

The rulings of the trial judge throughout the trial were fair; Stickel was defended by diligent and able counsel; the verdict of the jury forecloses debate about his guilt; and it therefore follows that the judgment must be and it is affirmed. AFFIRMED.

McBRIDE, C. J., and BENSON and BEAN, JJ., concur.